UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

In re:

Roxi A. Yaldoo,

    Debtor.

Chapter 13
Case No. 12-67025
Honorable Marci B. McIvor

_____/

Roxi A. Yaldoo,

    Plaintiff,

v

Adv. Proc. No._____

FEDERAL HOME LOAN MORTGAGE CORPORATION,
a corporation organized under the laws of the United States of America,
and, FEDERAL HOUSING FINANCE AGENCY,
a Federal Agency,

    Defendants.

_____/

## VERIFIED COMPLAINT FOR INJUNCTIVE, DECLARATORY AND OTHER RELIEF

Debtor, ("Plaintiff"), through his attorneys, Wolfe Law Group, PLLC, seeks injunctive and declaratory relief from this Court, to set aside the sale of the home/property located at 29380 Brooks Lane, Southfield, Michigan 48034 (the "property"), because Defendants, Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie"), a federal instrumentality, and the agency that took over Freddie, Federal Housing Finance Agency ("FHFA"), violated his constitutional rights by taking his property without a due process hearing.

1

## JURISDICTION AND VENUE

1.  This adversary proceeding is a core proceeding within the meaning of 28 U.S. C. § 157(b) (2) and §152(b)(2)(J).

2.  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a), (b)(1), and 28 U.S.C. § 2201.

3.  This is also a civil action:

    (a) Arising under the Constitution and laws of the United States and this Court has concurrent federal jurisdiction pursuant to 28 U.S.C. §1331;

    (b) To redress the deprivation, under the color of law, of the rights, privileges and immunities of Plaintiffs secured by the Constitution of the United States providing for equal rights of its citizens and of all persons of any jurisdiction in the United States, and this Court has concurrent jurisdiction pursuant to 28 U.S.C. §1334(3);

    (c) For declaratory judgment and injunctive relief pursuant to 42 U.S.C. §1983 and this Court has jurisdiction pursuant to 28 U.S.C. §1334(3); and,

    (d) For declaratory judgment, injunctive relief and money damages pursuant to 42 U.S.C. §§ 1983 and 1985.

4.  The principal events giving rise to the claims stated herein occurred in this district and venue is therefore proper in this district pursuant to 28 U.S.C. §§ 1391(b), 1408 and 1409.

5.  This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, Fed. R. Civ. P. 57 and 11 U.S.C § 1322, the latter which authorizes the confirmation of a plan to cure the arrearage of a defaulted loan and maintain the payments thereunder where the foreclosure sale of the property was not in accordance with non-bankruptcy laws.

6. FHFA must sue and be sued in federal court.

## THE PARTIES

7. Plaintiff is or was the fee simple owner of the property that has a current fair market of less than $150,000.00, based upon area comparisons and the type/condition of the property.

8. Freddie Mac is a corporation organized under the laws of the United States, operated by the United States as it was placed under the conservatorship of a federal agency on September 7, 2008 and conducts business in Michigan. The Congressional Research Service Report for Congress, "Fannie Mae and Freddie Mac in Conservatorship", by Mark Jickling, Specialist in Financial Economics Government and Finance Division (the "Report"), is attached as **Exhibit A**.

9. FHFA was formed to take over the government sponsored entity known as Freddie Mac.

## FACTUAL ALLEGATIONS

10. Plaintiff acquired the property by obtaining a loan (the "Loan") pursuant to a Note and Mortgage, with the Mortgage being recorded against the property.

11. Subsequent to the closing, Plaintiff defaulted on the Loan and non-judicial foreclosure proceedings were commenced against the property.

12. The beneficial and legal owner of the Note was Freddie Mac who was also the beneficial owner of the Mortgage at the time of the commencement of the foreclosure proceedings.

13. No constitutional protections arise under a non-judicial foreclosure pursuant to Chapter 32 of Michigan's compiled laws which were designed to simply enforce the private contract between purported private parties.

14. The property was taken to Sheriff's Sale by the servicing agent for Freddie Mac, JP Morgan Chase, N.A., and Freddie Mac credit bid the property for $393,137.78 (the "bid") at the Sheriff's Sale on September 13, 2011.

15. Freddie over bid the property at the Sheriff's Sale as its current fair market value is over 50% less than the bid and this bid was neither in good faith nor fair in violation of MCL 600.3228 of the non-judicial foreclosure laws of the State of Michigan compiled under Chapter 32 of the Revised Judicature Act of 1961.

16. The alleged redemption period for the property has expired notwithstanding the fact that current United States Sixth Circuit Court of Appeals precedent holds that no redemption period occurs if a structural violation of the non-judicial foreclosure statutes under Chapter 32.

17. At the time of the Sheriff's Sale, Freddie was not a private party but a government operated entity and/or a federal instrumentality and often referred to as a Government Sponsored Enterprise along with its sister company, Fannie Mae (singularly, "GSE" or collectively, "GSEs").

18. Freddie and FHFA as government agencies, government owned enterprises and/or federal instrumentalities, which owed a higher degree of notice and hearing to Plaintiff then provided by the non-judicial foreclosure process in the State of Michigan before taking Plaintiff's property and their failure to provide such notice and hearing violated his constitutional procedural and substantive due process rights.

19. Defendants cannot circumvent constitutional protections of homeowners and taxpayers who have Freddie Mac mortgage loans on their homes and this Court should declare and adjudge that Michigan's non-judicial foreclosure process was not promulgated for Defendants use that, instead, must pursue foreclosure of a Michigan homeowner by only judicial process which affords a Michigan homeowner like Plaintiff with full constitutional protections.

20. Chapter 32 of the Michigan compiled laws does not provide due process protections to the defaulting homeowner before taking his property pursuant to a sheriff's sale.

## COUNT I
## INJUNCTIVE RELIEF

21. Plaintiff incorporates paragraphs 1-20 as if more fully stated.

22. Freddie is a 100% federal government controlled and operated entity and cannot take property without a due process hearing.

23. Freddie Mac is a federal instrumentality.

24. Freddie Mac is operated and controlled by FHFA, a government agency.

25. The non-judicial foreclosure statutes under Chapter 32 do not meet the threshold of a due process hearing under the case law of this jurisdiction.

26. The Sheriff's Sale was not and is not a due process hearing.

27. The Sheriff's Sale violated Plaintiff's constitutional due process rights and the foreclosure in this case must only be under Chapter 31 judicial foreclosure.

28. Plaintiff seeks to have this Court enter an order permanently enjoining Fannie Mae and FHFA from using non-judicial foreclosure to acquire the property of Plaintiff, setting aside the Sheriff's Sale.

29. If this requested relief is not granted, Plaintiff will suffer irreparable harm and has no adequate remedy at law.

30. Plaintiff will prevail at trial on the merits of this case.

31. The public's best interests are served by Defendants being compelled and required to abide by the United States Constitution.

WHEREFORE, Plaintiff requests this Court enter an order setting aside the Sheriff's Sale in this matter as violating the constitutional due process hearing rights of Plaintiff as the foreclosing lender, Freddie Mac, through its controlling government agency, FHFA, is government owned and operated and/or a federal instrumentality prohibited from using the non-judicial, non-due process protocol of Chapter 32.

## COUNT II
## DECLARATORY RELIEF – DEFENDANTS VIOLATION OF DUE PROCESS

32. Plaintiff incorporates paragraphs 1-31 as if fully stated.

33. Defendants have acted in bad faith by refusing to offer Plaintiff all available options and relief applicable to distressed homeowners.

34. Defendants have violated the procedural due process rights of Plaintiff by not providing Plaintiff with notice of a hearing to protest and contest the foreclosure of his property.

35. Defendants have violated the substantive due process rights of Plaintiff by not allowing Plaintiff to have a hearing prior to the Sheriff's Sale where he could protest and contest the valuation of the property.

36. Defendants have violated Plaintiff's substantive due process rights by overbidding the property effectively terminating any opportunity for Plaintiff to redeem the property.

37. The Report specifically states that:

    A. "Fannie Mae and Freddie Mac are government-sponsored enterprises...with government charters-that play a central role in mortgage finance." The Report, p. 1;

6

B. "On September 7, 2008, [FHFA] placed the [GSEs] that play a critical role in the U.S. home mortgage market, in conservatorship." *Id.*;

C. "This means that the U.S. Taxpayer stands behind $5 Trillion of GSE debt. This step was taken because a default by either of the two [GSEs]...could have caused a severe disruption in global financial markets, made home mortgages more difficult and expensive to obtain, and had negative repercussions throughout the economy. " *Id.*;

D. "Over the years, the GSEs have provided strong support to the housing market....Without this secondary (or resale) market, in which private firms participate as well as the GSEs, the lenders would have to keep loans on their own books, and mortgage credit would become more expensive and difficult to obtain." *Id.*;

E. "...FHFA has full powers to control the assets and operations of the [GSEs]." *Id.*;

F. "The Housing and Economic Recovery Act of 2008...provides the authority for the government's takeover of the GSEs." The Report, p. 2;

G. "As conservator, the FHFA has taken over the assets and assumed all the powers of the shareholders, directors, and officers." The Report, p. 3;

F. "The conservatorship will end when the FHFA finds that a safe and solvent condition has been restored." *Id.*; and,

G. "FHFA's intervention has been described as a 'seizure' [or] 'takeover' [these] two terms are accurate...the FHFA as conservator has taken full control over the operations of the companies." *Id.*

7

38. Edward J. DeMarco, Director of the FHFA in a speech at the American Mortgage Conference in Raleigh, North Carolina on September 19, 2011, stated: "It ought to be clear to everyone at this point, given the Enterprises' losses since being placed into conservatorship and the terms of the Treasury's financial agreements, the Enterprises will not be able to earn their way back to a condition that allows them to emerge from conservatorship."

39. *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374 (1995), the seminal case to determine if Freddie Mac transformed to a government agency if Congress created the entity: "by special law, for furtherance of governmental objectives, and retain[ed] for itself permanent authority to appoint a majority of the directors of that corporation." *Lebron*, 513 U.S. at 400. The Lebron factors have also been listed as four factors: (i) specially created; (ii) for furtherance of important governmental objective(s); (iii) permanent; and (iv) control over a majority of the directors of the corporation.

40. Applying these factors to Freddie Mac, it was created by government charter through special law; to maintain a secondary market vital to our economy; controls the board of directors; and is permanent, which does not mean forever, but FHFA will run the GSEs until they are no longer in business which is permanent.

41. To this end, Plaintiff requests this Court declare and adjudge that Freddie Mac is a government entity as it is 100% controlled by a federal agency, that to deny due process before taking a U.S. citizens home is offensive when the taking is by a government actor and that requiring Fannie Mae and FHFA and it agents to provide homeowners with due process by only foreclosing pursuant to Chapter 31 will not affect the private sector.

WHEREFORE, Plaintiff requests this Court to determine and adjudge that the issues raised under Count II are ripe for determination and to compel Fannie Mae and/or FHFA to only

8

12-67025-mbm    Doc 21    Filed 01/17/13    Entered 01/17/13 13:38:38    Page 8 of 16

judicially foreclose under Chapter 31 of Michigan's compiled laws, setting aside the Sheriff's Sale as not being held in accordance with non-bankruptcy laws.

## COUNT III
## SLANDER OF TITLE/QUIET TITLE

42. Plaintiff hereby restates paragraphs 1-41 if more fully set forth herein.

43. Defendants violated the non-judicial foreclosure laws of the State of Michigan as set forth under Chapter 32 by overbidding the property at the Sheriff's Sale in violation of the good faith and fair standard of MCL 600.3228.

44. The overbidding prevented Plaintiff from redeeming the property which is neither in good faith nor fair.

45. The overbidding was not driven by market forces which is not in good faith and is not fair.

46. The violation of MCL 600.3228 was a structural defect in the non-judicial foreclosure process which has slandered the title of Plaintiff through its wrongful Sheriff's Sale which is void ab initio.

47. Through its wrongful foreclosure, Freddie Mac has become the fee simple owner of the property stripping from Plaintiff his rightful ownership as the Sheriff's Sale was not in accordance with non-bankruptcy law.

WHEREFORE, Plaintiff respectfully requests that this Court award damages no less than the current fair market value of the property, treble the damages, award attorney's fees and costs so wrongfully sustained due to the slander of title by Defendants as to its claim of ownership of the property, setting aside the Sheriff's Sale as void ab initio for the structural defect and violation of MCL 600.3228.

9

Respectfully submitted,

WOLFE LAW GROUP, PLLC

By: /s/Jack B. Wolfe
    Jack B. Wolfe (P39667)
    Audra A. Arndt (P63341)
    Attorneys for Plaintiff
    7071 Orchard Lake Road, Suite 250
    West Bloomfield, MI 48322
    (248) 862-2018 (w)
    (248) 862-2026 (f)

Dated: January 17, 2013     thewolfelawgroup@yahoo.com

**VERIFICATION**

Roxi A. Yaldo states that she has read the foregoing and that all statements contained therein are true to the best of her knowledge, information and belief.

    /S/ Roxi A. Yaldoo
    Roxi A. Yaldoo

Subscribed and sworn to before me
this 17th day of January, 2013

/S/    Audra Annette Arndt
Audra Annette Arndt
Oakland County, Michigan
My commission expires: 7-1-2013

10

# EXHIBIT A

Order Code RS22950
September 15, 2008



# CRS Report for Congress

# Fannie Mae and Freddie Mac in Conservatorship

Mark Jickling
Specialist in Financial Economics
Government and Finance Division

## Summary

On September 7, 2008, the Federal Housing Finance Agency (FHFA) placed Fannie Mae and Freddie Mac, two government-sponsored enterprises (GSEs) that play a critical role in the U.S. home mortgage market, in conservatorship. As conservator, the FHFA has full powers to control the assets and operations of the firms. Dividends to common and preferred shareholders are suspended, but the U.S. Treasury has put in place a set of financing agreements to ensure that the GSEs continue to meet their obligations to holders of bonds that they have issued or guaranteed. This means that the U.S. taxpayer now stands behind about $5 trillion of GSE debt. This step was taken because a default by either of the two firms, which have been battered by the downturn in housing and credit markets, could have caused severe disruptions in global financial markets, made home mortgages more difficult and expensive to obtain, and had negative repercussions throughout the economy. This report provides basic information on the GSEs, the government intervention, and the potential cost to the taxpayer. It will be updated as events warrant.

**Background.** Fannie Mae and Freddie Mac are government-sponsored enterprises (GSEs) — shareholder-owned corporations with government charters — that play a central role in mortgage finance. They buy home mortgages from the original lenders, repackage them as mortgage-backed securities (MBSs), and either sell them or hold them in their own investment portfolios. In 2008, Fannie and Freddie have purchased about 80% of all new home mortgages in the United States. Their combined investment portfolios held mortgage assets (loans and MBSs) valued at $1.5 trillion (as of June 30, 2008).

Over the years, the GSEs have provided strong support to the housing market. When a bank (or other lender) sells a mortgage loan to the GSEs, it receives cash to make new loans, and avoids the risks of holding a long-term asset. Without this secondary (or resale) market, in which private firms participate as well as the GSEs, lenders would have to keep loans on their own books, and mortgage credit would become more expensive and difficult to obtain.

Congressional Research Service ⦿ The Library of Congress
Prepared for Members and Committees of Congress

The turmoil in housing and credit markets that began in 2007 has put extreme financial pressure on the GSEs. The value of their mortgage assets has fallen, but the debt they took on to purchase those assets remains. To maintain a positive net worth in the face of falling asset values, financial firms have several options to raise capital, but none of these were readily available to Fannie or Freddie. If they sold assets, they would depress the prices of mortgage loans and MBSs still further, worsening both their own balance sheet problems and those of many other financial firms. They cannot use retained earnings to bolster capital because their operations have not turned a profit since 2006. Finally, rapidly falling share prices made it difficult to impossible to raise capital by selling new equity or common stock.

If Fannie and Freddie were purely private firms, rather than GSEs, some observers assert that they would have failed by mid-2008.[1] GSE status, however, has enabled them to continue to fund their operations by selling debt securities, because the market has long believed that Fannie and Freddie debt was "implicitly" guaranteed by the government, even though by law GSE obligations are not backed by the full faith and credit of the United States. In July 2008, however, the firms' share prices plunged sharply,[2] and the possibility emerged that market participants might refuse to extend credit to Fannie and Freddie under any terms. (This kind of "non-bank run" destroyed the investment bank Bear Stearns in March 2008.) Since then, every auction of new Fannie or Freddie debt (normally a routine event) has been followed closely by the press and the markets.

Even though Fannie and Freddie maintained access to the debt markets (albeit at higher-than-usual interest rates), their inability to raise new capital cast doubts on their long-term viability. If their interest costs continued to rise, and the value of (and their income from) mortgage assets kept falling, they were doomed to fail. Against this backdrop, the federal regulator concluded that "the companies cannot continue to operate safely and soundly and fulfill their critical public mission, without significant action" to address their financial weaknesses.[3]

**Government Intervention.** The Housing and Economic Recovery Act of 2008 (P.L. 110-289), enacted July 30, 2008, provides the authority for the government's takeover of the GSEs. The act created a new GSE regulator, the Federal Housing Finance Agency (FHFA), with the authority to take control of either GSE to restore it to a sound financial condition. The new law sets out a process for placing a financially troubled GSE in conservatorship or receivership. This process is generally similar to the Federal bank regulators' handling of insolvent depository institutions, but the FHFA is not bound by the bank regulators' mandate that failing institutions be resolved at the lowest possible cost.

---

[1] See, e.g., "Too Political to Fail," *Wall Street Journal*, Apr. 21, 2008, p. A16: "[the GSEs] aren't held to the same standards of accountability as everyone else in American business."

[2] In July 2007, both Fannie and Freddie shares traded above $60. Between July 8 and 15, 2008, Fannie Mae shares fell by 60%, from 17.51 to 7.02. Freddie Mac shares fell from 13.46 to 5.26, losing 61% of their value. On July 15, the Securities and Exchange Commission issued an emergency order restricting short selling in the two GSEs' shares.

[3] Federal Housing Finance Agency, "Statement of FHFA Director James B. Lockhart," Press Release, Sep. 7, 2008, p. 5.

Section 1117 of the act gives the Treasury emergency authority (expiring on December 31, 2009) to purchase an unlimited amount of GSE debt or equity securities if necessary to provide stability to the financial markets, prevent disruptions in the availability of mortgage finance, and protect the taxpayer.

On September 7, 2008, the FHFA established a conservatorship for Fannie and Freddie.[4] As conservator, the FHFA has taken over the assets and assumed all the powers of the shareholders, directors, and officers. It may take any necessary action to restore the firms to a sound and solvent condition. Stockholders' voting rights are suspended during the conservatorship, and both firms' CEOs have been replaced. Dividends on common and preferred stock have been suspended, although the shares continue to trade. GSE business operations will continue as before; the conservator will delegate authority to the companies' new management to move forward. The conservatorship will end when the FHFA finds that a safe and solvent condition has been restored.

A key element of the plan calls for the government to provide financing to Fannie and Freddie.[5] There are three funding mechanisms:

- **Senior Preferred Stock Purchase Agreement.** Treasury will buy preferred stock as needed to ensure that each GSE maintains a positive net worth. The capacity of the agreement is set at $100 billion for each GSE. In return, the government has received warrants to buy up to 79.9% of GSE common stock for $0.00001 per share. (This means that if the GSEs emerge from conservatorship as stock corporations, the government will be the majority owner, and will have the option of selling its shares at a profit.) According to the Treasury, holders of senior debt, subordinated debt, and MBSs issued or guaranteed by the GSEs are protected by the agreement.[6]

- **GSE MBS Purchase Program.** Treasury will buy newly issued Fannie and Freddie MBSs in the open market as needed to improve the availability and affordability of mortgage credit.

- **GSE Credit Facility.** The GSEs will have access to short-term loans from the Treasury, and will be allowed to post MBSs as collateral.

Treasury's and FHFA's intervention has been described as a "seizure," "takeover," "rescue," and "bail-out" of the GSEs. The first two terms are accurate — the FHFA as conservator has taken full control over the operations of the companies. "Bail-out" and "rescue" are more controversial terms. Common shareholders have lost their voting rights and nearly all their investment, and dividends on preferred and common shares have been

---

[4] See Federal Housing Finance Agency, "Fact Sheet: Questions and Answers on Conservatorship" (press release), Sep. 7, 2008, p. 3. Available online at [http://www.treas.gov//press/releases/reports/fhfa_consrv_faq_090708hp1128.pdf].

[5] Several fact sheets describing the financing arrangements were posted on the Treasury's website on September 7, 2008, at [http://www.ustreas.gov/news/index1.html].

[6] "Frequently Asked Questions: Treasury Senior Preferred Stock Purchase Agreement," Treasury Press Release HP-1131, Sep. 11, 2008.

suspended. On the other hand, the government action benefits the holders of debt issued or guaranteed by the GSEs, who receive "security and clarity" that the "conserved entities have the ability to fulfill their financial obligations."[7] In other words, the bondholders will be the recipients of any taxpayer funds transferred from Treasury to the GSEs under the financing agreement.

**Policy and Market Implications.** The takeover of Fannie and Freddie, and specifically the commitment to meet all the firms' obligations to debt holders, exposes the government to a potentially large financial risk. Debt issued or guaranteed by the GSEs totals more than $5 trillion. The ultimate value of the firms' assets is uncertain, and the Treasury — by stating that it will maintain a positive net worth in each GSE — has in effect agreed to cover all losses to the GSEs' combined $1.5 trillion portfolios.

During the current crisis, international commercial and investment banks have reported losses, or write downs of asset values, totaling over $500 billion.[8] Much of this stems from marking-to-market, or revaluing MBSs at estimated current market prices, which are often sharply below face value. By comparison, Fannie and Freddie's write downs have been modest: from the second quarter of 2007 through the second quarter of 2008, Fannie reported $5.3 billion in "credit losses," while Freddie reported $2.2 billion.[9] The contrast between the private banks' write downs — 25 individual institutions have reported losses (on much smaller holdings of mortgage-related assets) exceeding Fannie's $5.3 billion[10] — and those of the GSEs may suggest that Fannie and Freddie's portfolios contain substantial unrecognized losses. As any such losses are recognized, and any remaining capital is exhausted, Treasury will have to commit new capital (by purchasing preferred stock) to prevent the firms' net worth from falling below zero.

The risks of not acting, however, clearly appeared intolerable to the government. A failure or default by Fannie or Freddie would have severely disrupted financial markets around the world. If the GSE portfolios of mortgage loans and MBSs had to be liquidated, prices would plunge, the secondary market for mortgages would be decimated, and the supply of new mortgage credit might be severely restricted. These market disruptions would have negative impacts on the economy as a whole.

---

[7] "Statement by Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers," Treasury Press Release HP-1129, Sep. 7, 2008.

[8] Yalman Onaran, "Banks' Subprime Losses Top $500 Billion on Writedowns," *Bloomberg.Com*, Aug. 12, 2008. Available online at [http://www.bloomberg.com/apps/news?pid=20601087&sid=aSKLfqh2qd9o&refer=worldwide].

[9] Figures from Fannie Mae and Freddie Mac quarterly financial statements.

[10] Onaran, "Banks' Subprime Losses Top $500 Billion on Writedowns." The comparison between banks and GSEs is not exact. Many private firms may have held larger volumes of subprime MBSs than either Fannie or Freddie, including the most risky "toxic waste" tranches of MBS collateralized debt obligations. On the other hand, virtually all of the GSEs' assets are home mortgages — whole loans or MBSs. Firms like Citigroup and Merrill Lynch (who have written down $55.1 and $51.8 billion, respectively) never had the amount of undiversified exposure to the U.S. housing market that the GSEs have.

Postponing intervention, in the hopes that the mortgage market would right itself and return the GSEs to financial health, carried the risk of raising the ultimate cost to the taxpayers, had the financial deterioration continued.

Much of the current stress in housing and credit markets is based on uncertainty about the true values of mortgage-related financial instruments (and, of course, of houses themselves). As long as further declines are considered likely, market participants will be uncertain about each other's financial condition, and lending markets will remain tight. By intervening and in effect stating that it will bear any further losses to the GSEs (which hold a significant share of all home mortgage assets), the Treasury hopes to reduce that uncertainty and create conditions under which markets can return to normal.

If housing and financial market stability returns soon, the intervention may actually earn a profit for the Treasury. (As part of the funding agreement, Treasury will acquire preferred stock paying a 10% annual dividend, and also has the option to acquire 79.9% of the firms' common stock for a nominal price.) If, however, housing values continue to fall for an extended period, the taxpayer may be required to make good on substantial losses to Fannie's and Freddie's investment portfolios and guarantee obligations.